# SUPREME COURT OF THE UNITED STATES

### DAVID BOBBY, WARDEN, PETITIONER *v.* HARRY MITTS

#### ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

No. 10–1000.   Decided May 2, 2011

PER CURIAM.

An Ohio jury convicted respondent Harry Mitts on two counts of aggravated murder and two counts of attempted murder. He was sentenced to death. At issue here is part of the jury instructions given during the penalty phase of Mitts's trial. The instructions, in pertinent part, were as follows:

> "[Y]ou must determine beyond a reasonable doubt whether the aggravating circumstances, which [Mitts] was found guilty of committing in the separate counts, are sufficient to outweigh the mitigating factors you find are present in this case.
>
> "When all 12 members of the jury find by proof beyond a reasonable doubt that the aggravating circumstances in each separate count with which [Mitts] has been found guilty of committing outweigh the mitigating factors, if any, then you must return such finding to the Court.
>
> "I instruct you as a matter of law that if you make such a finding, then you must recommend to the Court that the sentence of death be imposed on [Mitts].
>
>        .        .        .        .        .
>
> "On the other hand, [if] after considering all the relevant evidence raised at trial, the evidence and testimony received at this hearing and the arguments of counsel, you find that the state of Ohio failed to prove

beyond a reasonable doubt that the aggravating cir-
cumstances with which [Mitts] was found guilty of
committing outweigh the mitigating factors, you will
then proceed to determine which of two possible life
imprisonment sentences to recommend to the Court."
App. to Pet. for Cert. 352a–353a.

We considered virtually the same Ohio jury instructions
last Term in *Smith* v. *Spisak*, 558 U. S. ___, ___ (2010)
(slip op., at 7). See *Mitts* v. *Bagley*, 620 F. 3d 650, 652
(CA6 2010) (noting that the "instructions in this case are
the same Ohio instructions that were given in" *Spisak*).
That case, like this one, involved review of a federal ha-
beas petition under the Antiterrorism and Effective Death
Penalty Act of 1996 (AEDPA). AEDPA provides, as rele-
vant here, that relief may not be granted unless the state
court adjudication "resulted in a decision that was con-
trary to . . . clearly established Federal law, as determined
by the Supreme Court of the United States." 28 U. S. C.
§2254(d)(1).

In *Spisak*, we reversed a Court of Appeals decision that
had found these instructions invalid under our decision in
*Mills* v. *Maryland*, 486 U. S. 367 (1988). See 558 U. S., at
___ (slip op., at 8–9). Up until our decision in *Spisak*,
Mitts had also pressed the claim that the instructions
were invalid under *Mills*. After *Spisak* rejected that
claim, the Court of Appeals in this case determined that
the instructions were contrary to our decision in *Beck* v.
*Alabama*, 447 U. S. 625 (1980), and accordingly vacated
Mitts's death sentence. See 620 F. 3d, at 658.

In *Beck*, we held that the death penalty may not be
imposed "when the jury was not permitted to consider a
verdict of guilt of a lesser included non-capital offense, and
when the evidence would have supported such a verdict."
447 U. S., at 627 (internal quotation marks omitted). We
explained that such a scheme intolerably enhances the

"risk of an unwarranted conviction" because it "interjects irrelevant considerations into the factfinding process, diverting the jury's attention from the central issue of whether the State has satisfied its burden of proving beyond a reasonable doubt that the defendant is guilty of a capital crime." *Id.*, at 638, 642. "[F]orcing the jury to choose between conviction on the capital offense and acquittal," we observed, "may encourage the jury to convict for an impermissible reason—its belief that the defendant is guilty of some serious crime and should be punished," even when there is "some doubt with respect to an element" of the capital offense. *Id.*, at 632, 642, 637. Because the scheme in *Beck* created a danger that the jury would resolve any doubts in favor of conviction, we concluded that it violated due process. See *id.*, at 638, 643.

According to the Court of Appeals below, the penalty phase instructions given at Mitts's trial—and the Supreme Court of Ohio decision upholding their use—were "contrary to" *Beck*, because they "interposed before the jury the same false choice" that our holding in *Beck* prohibits. 620 F. 3d, at 658, 657 (internal quotation marks omitted). Referring to the instructions as "acquittal-first," the Court of Appeals stated that they impermissibly required the jury to first decide whether to "acquit" Mitts of the death penalty before considering "mercy and some form of life imprisonment." *Id.*, at 656–657. Interpreting *Beck* to stand for the proposition that "a jury instruction violates due process if it requires a mandatory death penalty sentence that can only be avoided by an acquittal before the jury has an opportunity to consider life imprisonment," the Court of Appeals concluded that the instructions given during the penalty phase of Mitts's trial unconstitutionally "deprived the jury of a meaningful opportunity to consider" a life sentence. 620 F. 3d, at 658, 657 (internal quotation marks omitted).

The instructions here are surely not invalid under our

decision in *Beck*.  The concern addressed in *Beck* was "the risk of an unwarranted *conviction*" created when the jury is forced to choose between finding the defendant guilty of a capital offense and declaring him innocent of any wrongdoing.  447 U. S., at 637 (emphasis added); *id.*, at 638; see also *Spaziano* v. *Florida*, 468 U. S. 447, 455 (1984) (explaining that the "goal of the *Beck* rule" is "to eliminate the distortion of the factfinding process that is created when the jury is forced into an all-or-nothing choice between capital murder and innocence"); *Schad* v. *Arizona*, 501 U. S. 624, 646 (1991) ("Our fundamental concern in *Beck* was that a jury convinced that the defendant had committed some violent crime but not convinced that he was guilty of a capital crime might nonetheless vote for a capital conviction if the only alternative was to set the defendant free with no punishment at all").

The question here, however, concerns the penalty phase, not the guilt phase, and we have already concluded that the logic of *Beck* is not directly applicable to penalty phase proceedings.  In *California* v. *Ramos*, 463 U. S. 992 (1983), we rejected an argument that *Beck* prohibited an instruction to "a capital sentencing jury regarding the Governor's power to commute a sentence of life without possibility of parole."  463 U. S., at 994, 1006–1009.  In so doing, we noted the "fundamental difference between the nature of the guilt/innocence determination at issue in *Beck* and the nature of the life/death choice at the penalty phase."  *Id.*, at 1007.  In light of that critical distinction, we observed that "the concern of *Beck* regarding the risk of an unwarranted conviction is simply not directly translatable to the deliberative process in which the capital jury engages in determining the appropriate penalty."  *Id.*, at 1009; see also *Schad*, *supra*, at 647 (stating that the "central concern of *Beck* simply is not implicated" when the "jury was not faced with an all-or-nothing choice between the offense of conviction (capital murder) and innocence").

The jurors in Mitts's case could not have plausibly thought that if they declined to recommend the death penalty Mitts would "escape all penalties for his alleged participation in the crime." *Beck, supra*, at 629. They had just convicted him on two counts of aggravated murder and two counts of attempted murder. They were specifically instructed that if they did not find that the aggravating factors outweighed the mitigating factors—and therefore did not recommend the death penalty—they would choose from two life sentence options. There is accordingly no reason to believe that the jurors in this case, unlike the jurors in *Beck*, could have been improperly influenced by a fear that a decision short of death would have resulted in Mitts walking free.

We all but decided the question presented here in *Spisak* itself. After rejecting the contention that the Ohio instructions were contrary to *Mills*, we noted that "the Court of Appeals found the jury instructions unconstitutional for an additional reason, that the instructions 'require[d] the jury to unanimously reject a death sentence before considering other sentencing alternatives.'" 558 U. S., at \_\_\_ (slip op., at 9) (quoting *Spisak* v. *Mitchell*, 465 F. 3d 684, 709 (CA6 2006)). That is essentially the *Beck* claim presented here. See 620 F. 3d, at 658 (holding that a "jury instruction violates due process if it requires a mandatory death penalty sentence that can only be avoided by an acquittal before the jury has an opportunity to consider life imprisonment"). We rejected that claim in *Spisak* under AEDPA, noting that "[w]e have not . . . previously held jury instructions unconstitutional for this reason." 558 U. S., at \_\_\_ (slip op., at 9). Although neither the parties nor the courts below in *Spisak* had cited *Beck*, a separate concurrence in *Spisak* would have struck down the instructions in reliance on that decision. See 558 U. S., at \_\_\_ (Stevens, J., concurring in part and concurring in judgment) (slip op., at 3–6). The Court nonetheless

concluded that whatever the merits of that argument on direct review, "the jury instructions at Spisak's trial were not contrary to 'clearly established Federal law'" under AEDPA. *Id.*, at \_\_\_ (slip op., at 9). The same conclusion applies here.

The petition for certiorari and the motion for leave to proceed *in forma pauperis* are granted. The judgment of the Court of Appeals for the Sixth Circuit is

*Reversed.*